***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of the Deputy Commissioner with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act, the employer employing the requisite number of employees to be bound under the provisions of said *Page 2 
Act at the time of the incident on April 23, 2006, and at the time of the alleged incidents on or about April 13, 2007 and May 12, 2007.
2. The initial date of injury was April 23, 2006, and the alleged subsequent date of injury was April 13, 2007. The parties are unable to stipulate to the date of the alleged third accident occurring the weekend of May 12, 2007.
3. An employment relationship existed between plaintiff and employer-defendant on April 23, 2006 and April 13, 2007.
4. ACE USA/ESIS was the carrier of workers' compensation insurance for employer-defendant on April 23, 2006 and April 13, 2007.
5. Plaintiff's average weekly wage at the time of injury was $2,359.74, yielding a maximum compensation rate of $730.00.
 *********** EVIDENTIARY RULING
Defendants' Motion to Add Additional Evidence filed on November 3, 2008 to which plaintiff objected and which was held in abeyance, is hereby DENIED.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of her compensable injury by accident on April 23, 2006, plaintiff was employed by defendant-employer as a "salaried pharmacist."
2. As a "salaried pharmacist," plaintiff was required to work an average of at least 40 hours per week. Typical shifts for a "salaried pharmacist" were 12 hours long. Plaintiff's job *Page 3 
duties involved filling prescriptions and answering customer calls and questions. The job could be busy and stressful with few breaks, and involved tilting and turning the head to fill orders and answer telephones.
3. Plaintiff worked significantly more than 40 hours per week before her April 2006 accident due to there being a shortage of pharmacists.
4. On April 23 2006, plaintiff suffered an admittedly compensable injury by accident when she was side swiped by another automobile, causing her car to crash into a guard rail at 70 miles per hour.
5. Prior to the April 23, 2006 accident, plaintiff did not have a history of back or neck problems. She had a history of depression for which she was treated in 2001 and again in 2005, as well as a diagnosis of attention deficit disorder.
6. After the accident, plaintiff continued to try to work her regular "salaried" job at defendant-employer, but had increasing pain and began leaving her shifts early due to her problems. Plaintiff began taking sick and holiday leave to reach her 40 hour minimum. Plaintiff worked only 61 hours in the two week pay period immediately following the accident, and took 19 hours of paid leave.
7. On May 6, 2006, plaintiff saw Physician Assistant Julie Drew at Capitol Family Medicine. Ms. Drew gave plaintiff a note reducing her to part-time work for two weeks. Ms. Drew did not know how long plaintiff's normal hours were and intended to reduce her to 4-hour days. Ms. Drew diagnosed cervical, trapezium and rhomboid strain related to the car accident.
8. Plaintiff reduced her hours worked, but not to the extent recommended by Ms. Drew. *Page 4 
9. On June 6, 2006, plaintiff returned again to see Ms. Drew and complained of increased stressors and pain relating to her accident and trying to work. Ms. Drew added a diagnosis of depression. Plaintiff was given another note stating that she could work six hours a day for two weeks.
10. Plaintiff did not immediately reduce her hours but continued accepting longer shift assignments. However, on or about June 10, 2006, plaintiff had such a bad flare up of pain at work that she was in tears and left early.
11. After June 10, 2006, defendant-employer moved plaintiff to a new position called "floater pharmacist." The change was made due to plaintiff's neck pain. Except for a short period of work at Harris Teeter from May 8 or 9, 2007 until June 21, 2007, plaintiff remained a "floater" from approximately June 11, 2007 through the date of the hearing before the Deputy Commissioner.
12. The "floater" position was full-time but only required a minimum of 30 hours per week averaged over a two-week period. A typical "floater" shift was 12 hours, the same as for a "salaried" pharmacist. The schedule and stores varied. The duties and hourly pay otherwise remained the same. However, unlike a "salaried" pharmacist, the "floater" position allowed plaintiff to have a flexible schedule, schedule a shift shorter than 12 hours, make changes in her schedule to accommodate her health, schedule work at stores with a lighter work load, and work less than 40 hours without providing a doctor's note.
13. On August 22, 2006, Dr. Jozewicz diagnosed a small central disc herniation at C3-4 and found that plaintiff "continues with neck pain, muscle spasm and at times burning in her neck area, interferes with her job. . . . She is very emotional in the office and she is crying." *Page 5 
On September 26, 2006, Physician's Assistant Julie Drew recommended counseling and that plaintiff see a specialist.
14. During the period from June 2006 through mid-September 2006, plaintiff worked an average of approximately 30 to 35 hours per week. Her earnings during this period, including her paid leave, remained below her pre-injury average weekly wage. Plaintiff's productive hours varied from a low of 53.6 hours to a high of approximately 67 hours. Her reduced hours and earnings were due to her neck pain.
15. Beginning in approximately late September 2006, plaintiff began increasing her hours. Plaintiff's earnings exceeded her pre-injury wage for three pay periods ending September 30, 2006, October 14, 2006, and October 28, 2006. During that period, plaintiff was assigned to a store in Kinston near her parents and could live with them, which made it easier to work longer hours. From the November 11, 2006 through December 9, 2006 pay period, plaintiff's earnings declined and were less than her pre-injury earnings.
16. Plaintiff's medical records in the fall of 2006 remain consistent with her complaints of pain made worse by work. On October 16, 2006, Dr. Jozewicz reported plaintiff "still is not able to perform fully at work and had to cut down on her office work and pharmacy hours."
17. On November 22, 2006, defendants filed a Form 60 accepting plaintiff's injury as compensable. Defendants began directing plaintiff's medical care and authorized treatment with Dr. Godbout, a physiatrist at Carolina Back Institute.
18. Plaintiff saw Dr. Godbout on December 4, 2006. At the appointment she was very tearful, described pain and numbness exacerbated with standing, and admitted a past *Page 6 
medical history of depression. Dr. Godbout diagnosed cervicalgia, or neck pain, secondary to cervical facet syndrome.
19. Plaintiff subsequently had a flare up and began missing more time from work. She was only able to work 25 hours in pay period ending December 23, 2006. On December 20, 2006, Dr. Godbout felt plaintiff was having an "escalation of depressive symptoms" and wrote a note limiting her to no more than 4 hours of work per day and no driving over 30 minutes. Dr. Godbout also recommended that plaintiff be seen by a pain management psychologist, Dr. Paul Krasner. Defendants did not authorize the recommended treatment.
20. Because defendant-employer could not provide a 20 hour per week position, plaintiff went out of work and received temporary total disability compensation from December 20, 2006 through January 15, 2007. Prior to December 20, 2006, defendants did not pay any disability compensation.
21. On January 18, 2007, Dr. Godbout continued plaintiff's work restrictions but increased her hours to 30 per week with no lifting over 20 pounds and minimal repetitive reaching.
22. Plaintiff was allowed to return to work at the "floater" position on a reduced schedule after January 18, 2007. Plaintiff's earnings records indicate she worked 12 hours during the pay period ending January 20, 2007, receiving $601.02; 16 hours during pay period ending February 3, 2007, earning $803.39; and 27 hours during pay period ending February 17, 2007, earning $1,389.38. Using an incorrect average weekly wage, defendants paid temporary partial disability compensation of $2,815.74 for this period. No compensation was paid for the period from February 18, 2007 until Dr. Godbout released plaintiff at maximum medical improvement on February 28, 2007. *Page 7 
23. By February 8, 2007, plaintiff reported improvement to Dr. Godbout. On that date, Dr. Godbout added a diagnosis of myofascial pain syndrome. He recommended work conditioning and anticipated full duty return to work at the end of the program.
24. Plaintiff attended the work conditioning evaluation but did not begin the program. Instead, at the evaluation she expressed fear of regressing, and was unable to complete the session due to "increased anxiety and reports of pain increase." The evaluator reported that plaintiff was in "pretty good" physical shape but cautioned that she was concerned about "emotional and psychological stressors."
25. Plaintiff did not return to work conditioning. Instead, she had a one-time visit on September 26, 2007 with a psychiatrist, Dr. Rohima Miah, who diagnosed plaintiff with "MDD [Major Depressive Disorder] — recurrent" with a history of ADHD, and status post motor vehicle accident with chronic pain.
26. Two days later, on February 28, 2007, plaintiff returned to Dr. Godbout on an unscheduled visit. She reported her "great difficulty" with the work conditioning program, was very tearful and emotional, reported difficulty sleeping, brought both parents to the visit, and insisted on returning to work full-time. She also asked for additional trigger point injections.
27. Dr. Godbout diagnosed plaintiff as still having cervical and thoracic myofascial pain and cervical facet syndrome and depression and anxiety with psychosomatic symptoms. Dr. Godbout released plaintiff to full duty work with 30 pound lifting restrictions. He wrote that "from a functional standpoint, there is no question she can return to work. From an emotional standpoint, she may have some difficulties handling stress." Dr. Godbout did a second trigger point injection but noted plaintiff should in the future rely on "coping skills" rather than injections. He found plaintiff to be at maximum medical improvement and released her with a *Page 8 
3% impairment rating. However, Dr. Godbout again recommended treatment with a pain psychologist.
28. Plaintiff returned to the "floater" position. Her earnings during the mid-February to May 2007 period show one period of no wage loss, for the pay period ending April 14, 2007. Otherwise, plaintiff earned less than her pre-injury wages and worked less than 40 hours per week.
29. Plaintiff began treating with Dr. Patel, a family medicine doctor, on April 9, 2007. Dr. Patel did a trigger point injection. This treatment was not authorized by defendants.
30. On April 13, 2007, plaintiff was involved in a second motor vehicle accident unrelated to her employment when her vehicle was struck from behind. Plaintiff experienced increased pain with her neck and left arm and went to the Rex Healthcare Emergency Room where she was diagnosed with an acute cervical strain.
31. Plaintiff voluntarily left her job with defendant-employer on or about May 8, 2007, and on May 9, 2007 began a pharmacist position at Harris Teeter. For the period from May 9, 2007 through June 20, 2007, plaintiff does not allege wage loss.
32. The Harris Teeter job involved 40 hours per week and 12 hour shifts. Plaintiff took the job for the money and thought she could do it because she believed there would be fewer prescriptions and less work.
33. From May 9, 2007 through June 4, 2007, plaintiff had an initial period of training at Harris Teeter during which she made her own schedule and did not do pharmacy work.
34. On May 11, 2007, plaintiff was in a third motor vehicle accident when she rear ended another vehicle. She broke her foot and had some increased neck pain. *Page 9 
35. Plaintiff saw Dr. Patel again on May 22, 2007 and reported the car accidents. She had observable muscle spasms and received another trigger point injection.
36. On May 30, 2007, plaintiff returned to Dr. Patel with no relief form the trigger point injections. Plaintiff again had observable muscle spasms. Dr. Patel diagnosed myofascial pain syndrome in plaintiff's neck and upper back, and gave her a note restricting her to 6-hour days for three weeks and stating she could "consider 8 to 12 hours after ready, from a medical standpoint."
37. On June 5, 2007, plaintiff's training at Harris Teeter ended and she worked her first full shift as a pharmacist.
38. On June 6, 2007, plaintiff returned to Dr. Godbout. At that visit she reported her job change and the motor vehicle accidents and indicated she was not in pain. Dr. Godbout was under the impression that plaintiff had been working 12 hour days at Harris Teeter for two weeks and found her to be doing well. He released her to work full duty with no restrictions and recommended continuing use of her medication.
39. For the next two weeks, plaintiff continued to try to work regular 12 hour shifts at Harris Teeter. She discovered that the work in fact was very busy without help or breaks. Her pain increased and she was never able to work a full 40 hour week. Accordingly, plaintiff quit the Harris Teeter position and returned to work for defendant-employer in the same "floater" position on June 21, 2007.
40. Defendant-Employer put plaintiff back into a "floater" position based on her history of neck pain. Plaintiff was not required to produce a doctor's note in order to get the limited hours of a "floater" position. At that time the "floater" position changed to require 35 *Page 10 
hours, after an acquisition by Rite Aid Corporation of the Eckerds stores, but dropped back down to 30 hours sometime during the winter of 2007.
41. Plaintiff resumed working a schedule with shorter shifts and continued to vary her schedule week to week according to how her neck felt. Plaintiff's earnings for the period from June 20, 2007 through the hearing date only equaled or exceeded her pre-injury earnings for two pay periods, November 10, 2007 and January 6, 2008. Plaintiff's lower earnings were a result of the fact that she rarely exceeded 40 hours per week.
42. Plaintiff had a short period of several months after the April and May 2007 motor vehicle accidents when her neck bothered her more than before. However, by the end of the summer of 2007 her neck had improved.
43. Plaintiff continued to experience flare-ups during fall and winter 2007. At doctors' appointments she had observable muscle spasms and received trigger point injections.
44. Plaintiff saw Dr. Patel on December 6, 2007 complaining of a "significant increase in pain" in her neck. She had decreased range of motion, tenderness and muscle spasm, and received trigger point injections.
45. Dr. Patel saw plaintiff again on January 14, 2008, and on that occasion wrote a note restricting her to 30 hours of work per week, with only 30 minutes of driving.
46. Plaintiff's pay records for pay periods beginning January 19, 2008 indicate biweekly hours of 64 and 50 hours and earnings below her pre-injury wages.
47. On January 7, 2008, plaintiff also began seeing Dr. Paul Krasner, the pain psychologist recommended by Dr. Godbout. Dr. Krasner diagnosed plaintiff with chronic pain syndrome and recommended follow up for behavioral pain management skills. He saw plaintiff three more times and now treats her on an as-needed basis. *Page 11 
48. With regard to plaintiff's ability to work, Dr. Godbout testified that as of February 28, 2007, plaintiff was capable of working a 30 hour per week floater pharmacist position. He also felt she was physically capable of working a 40 hour per week job: "If you're asking me, was she physically should she have been physically able to perform that job, my answer would be yes." The undersigned finds that Dr. Godbout's opinion was based on her physical functioning and did not include consideration of her psychological impairments at that time.
49. As of when he last saw her on June 6, 2007, Dr. Godbout testified that plaintiff would have been capable of working a 40 hour salaried pharmacist position. However, Dr. Godbout conceded that if plaintiff was having more muscle spasms after he last saw her, his opinion might change, but he declined to address such questions "because I didn't see her during that time."
50. Dr. Patel diagnosed chronic myofascial pain syndrome with trigger points. In his opinion, plaintiff's condition was related to the compensable April 2006 car accident, and it was aggravated by the April 2007 car accident. He felt it was only "possible" that the May 11, 2007 accident further aggravated her pre-existing neck condition. Dr. Patel further testified, and the undersigned finds, that any aggravation of plaintiff's back condition from the April 2007 and May 2007 car accidents resolved by late summer 2007.
51. Dr. Patel testified that during 2007, six to eight hour work days would have been appropriate for plaintiff and that plaintiff should not work a 12-hour shift "with any regularity." Dr. Patel further testified that plaintiff could use her discretion in deciding which shift assignments to take, and approved of allowing plaintiff to vary her hours week to week. However, going over 35 hours per week would put plaintiff at risk of increased pain. Finally, Dr. Patel testified that plaintiff seeing a pain counselor was appropriate. *Page 12 
52. Dr. Krasner testified that plaintiff's work history of continually attempting to work more hours despite her doctors' recommendations was consistent with her difficulty setting limits. Dr. Krasner explained that stress for chronic pain patients is a "big factor" because more stress increases the patient's pain. With regard to plaintiff, Dr. Krasner testified: "I think the major stressor was her work." Dr. Krasner's treatment has involved helping plaintiff set boundaries, especially at work.
53. Dr. Krasner further opined, and it is hereby found, that plaintiff's underlying pain from her work injury is a significant contributing factor to her need for the psychological treatment he has provided.
54. With regard to work restrictions, Dr. Krasner testified that plaintiff should not be attempting to work 12 hour shifts or 45 hours in a week. He agreed that a 30-hour work restriction is appropriate, but did not have an opinion regarding how long those restrictions would be necessary. Finally, Dr. Krasner testified, and is hereby found, that plaintiff is not at maximum medical improvement for her psychological condition, and she will require further treatment for this condition.
55. Based upon the greater weight of the evidence of record, the treatment provided by Dr. Patel and Dr. Krasner is reasonably required to effect a cure or provide relief of plaintiff's work injury, including plaintiff's psychological condition.
56. Greater weight is given to the opinions of Dr. Patel and Dr. Krasner with regard to plaintiff's ongoing work restrictions because these doctors have continued to treat plaintiff after she was released by Dr. Godbout on June 6, 2007 and because Dr. Godbout declined to address plaintiff's ability to work after he last saw her. *Page 13 
57. Based upon the greater weight of the medical evidence of record, appropriate work restrictions for plaintiff are working approximately 30 to 35 hours per week, with shorter than 12 hour shifts, if necessary, and with plaintiff having the flexibility to make reasonable adjustments to her work hours based upon her pain at a particular time. Except for periods when plaintiff was taken completely out of work, these restrictions have been appropriate since plaintiff's injury by accident on April 23, 2006 to the present and continuing, until plaintiff is advised differently by Dr. Patel and Dr. Krasner.
58. Based upon plaintiff's earnings, and as a result of her injury, plaintiff was unable to earn her pre-injury wages in the same or any other employment for the following periods: April 23, 2006 through September 16, 2006; October 29, 2006 through November 26, 2006; December 10, 2006 through December 20, 2006; February 18, 2007 through March 31, 2007; April 15, 2007 through May 12, 2007; June 20, 2007 through October 27, 2007; November 11, 2007 through December 22, 2007; and from January 7, 2008 and continuing for any pay period that plaintiff earns less than her average weekly wage pursuant to restrictions from Dr. Patel and Dr. Krasner.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an admittedly compensable injury to her upper back as a result of an accident arising out of and in the course of her employment with defendant-employer on April 23, 2006. N.C. Gen. Stat. § 97-2(6).
2. The medical evidence of record establishes a causal relationship between plaintiff's injury by accident of April 23, 2006 and her cervical facet syndrome and cervical and *Page 14 
thoracic myofascial pain syndrome with chronic pain and muscle spasms. Thus, these conditions are compensable. Additionally, as a result of her compensable upper back injuries, plaintiff developed psychological conditions consisting of pain-induced stress and depression. Therefore, these conditions are compensable. Wilder v. Barbour Boat Works, 84 N.C. App.188, 352 S.E.2d 690 (1987).
3. On April 13, 2007 and possibly on May 11, 2007, plaintiff temporarily aggravated her compensable upper back injury as a result of additional motor vehicle accidents. The aggravation of plaintiff's pre-existing compensable upper back condition constituted a natural consequence that flowed from the April 23, 2006 accident and was not the result of an independent intervening cause attributable to plaintiff's own intentional conduct. Therefore, the aggravated condition, which resolved within a few months, is compensable. Horne v. Universal LeafTobacco Processors, 119 N.C. App. 682, 459 S.E.2d 797 (1995).
4. As a result of her compensable injuries, plaintiff experienced chronic pain, muscle spasms, stress, depression and other symptoms that resulted in her having reduced earning capacity, thus entitling plaintiff to payment of temporary partial disability compensation for the following periods: April 23, 2006 through September 16, 2006; October 29, 2006 through November 26, 2006; December 10, 2006 through December 20, 2006; February 18, 2007 through March 31, 2007; April 15, 2007 through May 12, 2007; June 20, 2007 through October 27, 2007; November 11, 2007 through December 22, 2007; and from January 7, 2008 and continuing for any pay period that plaintiff earns less than her average weekly wage pursuant to restrictions from Dr. Patel and Dr. Krasner, or further Order of the Commission. To the extent plaintiff has received sick or vacation pay for any period that temporary partial disability compensation is due, plaintiff is entitled to elect to have this time restored, and defendant *Page 15 
employer shall be entitled to a credit for sick and vacation pay received by plaintiff. N.C. Gen. Stat. §§ 97-30 and 97-42.
5. Plaintiff is entitled to payment of medical expenses incurred or to be incurred as a result of her compensable conditions as may reasonably be required to effect a cure, provide relief, or lessen the period of disability, including treatment provided by Dr. Godbout, Dr. Patel, and Dr. Krasner. N.C. Gen. Stat. §§ 97-25 and 97-25.1.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee approved below and the maximum compensation rate of $730.00 per week, defendants shall pay temporary partial disability compensation to plaintiff for the following periods: April 23, 2006 through September 16, 2006; October 29, 2006 through November 26, 2006; December 10, 2006 through December 20, 2006; February 18, 2007 through March 31, 2007; April 15, 2007 through May 12, 2007; June 20, 2007 through October 27, 2007; November 11, 2007 through December 22, 2007; and from January 7, 2008 and continuing for any pay period that plaintiff earns less than her average weekly wage pursuant to restrictions from Dr. Patel and Dr. Krasner, or further Order of the Commission. As much of said compensation as has accrued shall be paid in a lump sum. To the extent plaintiff has received sick or vacation pay for any period that temporary partial disability compensation is due, plaintiff may elect to have this time restored, and defendant-employer shall be entitled to a credit for sick and vacation pay received by plaintiff. *Page 16 
2. Defendants shall pay for medical expenses incurred or to be incurred as a result of plaintiff's compensable conditions as may reasonably be required to effect a cure, provide relief, or lessen the period of disability, including treatment provided by Dr. Godbout, Dr. Patel, and Dr. Krasner.
3. A reasonable attorney's fee in the amount of twenty-five percent (25%) is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel in one lump sum from the accrued amount due plaintiff and thereafter by deducting every fourth compensation check due plaintiff.
4. Defendants shall pay the costs due the Commission.
S/____________________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/____________________________ CHRISTOPHER SCOTT COMMISSIONER
 S/____________________________ LAURA K. MAVRETIC COMMISSIONER